907 A.2d 416 (2006)
188 N.J. 321
In the Matter of Registrant T.T.: Application for Judicial Review of Notification and Tier.
Supreme Court of New Jersey.
Argued April 4, 2006.
Reargued September 11, 2006.
Decided October 3, 2006.
Howard A. McGinn, Assistant Prosecutor, argued the cause for appellant State of New Jersey (Thomas S. Ferguson, Warren County Prosecutor, attorney).
Carol J. Sands, Assistant Deputy Public Defender, argued the cause for respondent T.T. (Yvonne Smith Segars, Public Defender, attorney; Ms. Sands and Michael Z. Buncher, Deputy Public Defender, of counsel and on the briefs).
Jessica S. Oppenheim, Assistant Attorney General, argued the cause for amicus curiae, Attorney General of New Jersey (Zulima V. Farber, Attorney General, attorney; Ms. Oppenheim and Annmarie Taggart, Deputy Attorney General, of counsel and on the brief).
PER CURIAM.
On January 15, 2000, T.T., then twelve years old, was at the Phillipsburg home of L.B., his father's girlfriend. At that time, T.T. was living with his mother but frequently visited his father on the weekends. He had slept over at L.B.'s house the night before. Shortly before *417 8:00 a.m., R.B., L.B.'s six-year-old son,[1] brought two boxes of douches to his mother. He told her that T.T. had stuck one in his "heiney," pushed it hard, and continued to do it even though R.B. said that it hurt.
According to R.B., T.T. woke him up in the early morning while it was still dark outside, told him to turn around, and "then he threw me on the couch and took off my pants and put it up in my butt." T.T. told R.B. not to tell and that if R.B. did tell, T.T. would punch R.B. and do it again.
T.T. admitted that he put something into R.B.'s anus, but said he did not know what the thing was. T.T. explained that he took the item, an already-open douche, out of a box that had been on the dresser; that R.B. had taken off his own clothes and was kneeling on the couch while T.T. was standing beside him on the floor; that T.T. said nothing as he put the douche in R.B.'s anus, squeezing liquid from it; and that R.B. said nothing, did not complain, and made no noise. According to T.T., he put about two to three inches of the douche into R.B. and kept it there for two seconds. Seconds later, while R.B. was still on the couch, T.T. put the same douche in his own anus, squeezed it, put it back in its box, and replaced it on the dresser.
According to both T.T. and R.B., neither child touched any part of the other's body and nothing similar had ever occurred before. When asked twice why he did it, T.T. responded, "I don't know." T.T. was charged in a juvenile delinquency complaint with "aggravated sexual assault by committing an act of sexual penetration upon R.B. when R.B. was less than thirteen years old, by sticking a foreign object in R.B.['s] anus."
In a February 15, 2000 psychosexual evaluation by Dr. W. Michael Shea, T.T. was unable to state a motive for what he did to R.B., but indicated that it was "stupid" and that he should not have done it. Dr. Shea concluded that:
[T.T.] presents as a young adolescent who requires intensive services and supervision. It is likely that without significant intervention, risk for ongoing behavioral problems and antisocial acts are likely. Consequently, it is strongly recommended that those involved with [T.T.] and his family consider treatment programs that will address his needs. Specifically, [T.T.] requires intensive individual and group counseling, including sex offender specific interventions. It is unlikely that he could be maintained at home at this time.
On March 27, 2000, at a proceeding before a Warren County Superior Court judge, T.T. pled guilty to aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1). On July 24, 2000, the trial judge adjudicated T.T. delinquent and sentenced him to time served, placed him on probation for three years, and required him to register under Megan's Law. On August 7, 2000, T.T., then thirteen years old, registered as a sex offender.
In November 2000, while T.T. was attending the Hunterdon Learning Center, the Hunterdon County Prosecutor gave notice of T.T.'s moderate risk, Tier Two classification, based on a Registrant Risk Assessment Score[2] (RRAS) of 57. T.T. sought review, but moved back to Warren County before the pre-conference hearing. The case was then transferred back to Warren County.
*418 On September 12, 2001, T.T. entered the Bonnie Brae School, a residential treatment center in Somerset County, where he received various services including sex offender treatment. In December 2003, while T.T. was a resident at the Bonnie Brae School, the Somerset County Prosecutor issued a Notice of Proposed Tier Two Classification, based on an RRAS of 47, and Tier One community notification, based on the intra-familial nature of the offense. T.T. was discharged from Bonnie Brae on January 5, 2004 after successfully completing the program. T.T.'s file was then transferred back to Warren County.
On May 4, 2004, T.T. was interviewed by the Warren County Prosecutor's Office. At that time, he stated that at first, he did not feel guilty about the incident with R.B. but later felt a "little" guilt. He apologized to R.B. after his release from Bonnie Brae and stated that the two "get along pretty good." He was not in therapy at that time, and said that his mother was his external support system.
On October 4, 2004, the Warren County Prosecutor served T.T. with a Notice of Proposed Tier Two Classification and community notification, based on a RRAS score of 54. In February 2005, Dr. Timothy Foley evaluated T.T. and concluded that T.T.'s offense was a "boundary violation involving a young child;" that there was "no strong suggestion that his behavior was sexually motivated;" and "[m]ore importantly, there is no report of prior or subsequent sexual misconduct." Dr. Foley considered T.T.'s risk of a similar offense low, if the index offense was sexually motivated. T.T. sought review of his Tier Two classification and community notification.
At an April 27, 2005 hearing, T.T. presented the expert testimony of Dr. Foley, who reiterated the "large question mark about whether or not there was any sexual motive" underlying the crime. The State did not present expert testimony. The judge concluded that regardless of his possible lack of sexual motivation, T.T. was subject to Megan's Law based upon his adjudication for the predicate offense of aggravated sexual assault:
I do not find that the lack of sexual motivation to be dispositive of the issue before the court or the applicability of the registrant risk assessment scale. The registrant has been adjudicated delinquent based on an act of aggravated sexual assault, i.e., anal penetration. By definition that offense is subject to the registration requirements of Megan's Law. If a sexual assault, which is not motivated by sexual deviance or by sexual gratification or sexual debasement of the victim is to be carved out as an exception to the Megan's Law registration requirements, it is not for this court to carve that exception out. I am bound by the law as I find it, and that is that having been adjudicated of an act of aggravated sexual assault, the registration requirements of Megan's Law apply 2C:7-1.
Noting that expert testimony assisted but did not bind the fact-finder, the judge determined that the State's proposed scope of notification[3] and Tier Two risk assessment were proper.
T.T. appealed, and the Appellate Division reversed by order:
When he was 13, TT inserted a "douche" bottle in his 6-year old half brother's anus on one occasion; inserting it in his own anus thereafter. In *419 effect TT gave an enema to his half brother and then to himself.
The fundamental issue is whether TT's act was a sexual one. TT contends it was not. His expert, Dr. Foley, testified that he could find no sexual motivation. It is a question which requires expert assistance and is not resolved by TT's plea or adjudication. TT lacked an understanding of the sophisticated question as to whether his act was sexual in nature. The act is not denied  its significance for purposes of the RRAS must be established  and by clear and convincing evidence. See In re Registrant J[.G.], 169 N.J. 304, 331-32 [777 A.2d 891] (2001).
The 54 point RRAS score is derived from the treatment of the offense as sexual in nature. If it was not, the score fails  moreover, there is no sexual offense to bring TT within the ambit of Megan's Law.
We are satisfied the State has not proven by clear and convincing evidence that the act was sexual in nature. Dr. Foley could find no sexual motivation. The State offered no evidence to the contrary. The report of Dr. Shea did not deal with TT's motivation. His finding that TT needed sex offender specific interventions appears based on his conclusion that TT masturbates excessively.
The order is reversed and the matter is remanded for entry of an order dismissing the State's petition.
We granted the petition for certification filed by the Warren County Prosecutor, 185 N.J. 297, 884 A.2d 1267 (2005), along with the Attorney General's application for amicus curiae status.

I
Both the State and the Attorney General argue that T.T. is subject to the registration requirement of Megan's Law, and that we should reject the Appellate Division's engrafting of a new "sexual motivation" element onto the predicate offense for the applicability of the statute.
T.T. counters that he should not be subject to Megan's Law because his offense was not sexual in nature and lacked a sexual purpose or intent. Further, T.T. argues that the use of the RRAS is inappropriate in this case because, without an underlying sexual offense, any score that it delivers is meaningless. Alternatively, T.T. claims that even if we find that he is subject to Megan's Law, he should be granted Tier One notification status because he is a low risk for re-offense based upon the intra-familial nature of his offense and because he is a young juvenile offender.

II
Megan's Law was enacted in 1994 because:
a. The danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children, and the dangers posed by persons who prey on others as a result of mental illness, require a system of registration that will permit law enforcement officials to identify and alert the public when necessary for the public safety.
b. A system of registration of sex offenders and offenders who commit other predatory acts against children will provide law enforcement with additional information critical to preventing and promptly resolving incidents involving sexual abuse and missing persons.
[N.J.S.A. 2C:7-1.]
The law's two components are registration and notification. It requires certain sex offenders, depending on the type and time of offense, to register with local law enforcement agencies. N.J.S.A. 2C:7-2. "A *420 person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity" for what the Legislature has denominated a "sex offense" must register under Megan's Law. N.J.S.A. 2C:7-2(a)(1). Among other offenses enumerated by the Act is aggravated sexual assault.[4]N.J.S.A. 2C:7-2(b). Within prescribed time periods, a registrant must notify appropriate law enforcement upon a change of address, job, or school. N.J.S.A. 2C:7-2(d). The second component of Megan's Law is notification to the community concerning registrants assessed to be at moderate or high risk to re-offend. N.J.S.A. 2C:7-5 to -11; In re Registrant M.F., 169 N.J. 45, 52, 776 A.2d 780 (2001).
N.J.S.A. 2C:7-8(a) requires the Attorney General to develop guidelines and procedures for notification under Megan's Law. "The guidelines shall identify factors relevant to risk of re-offense and shall provide for three levels of notification depending upon the degree of the risk of re-offense." N.J.S.A. 2C:7-8(a). The non-exhaustive factors include whether the victim was a child, the relationship between offender and victim, whether psychological profiles show a risk of recidivism, and the offender's response to treatment. N.J.S.A. 2C:7-8(b).
The statute continues that the "regulations shall provide for three levels of notification depending upon the risk of re-offense." N.J.S.A. 2C:7-8(c). If risk of re-offense is low, law enforcement officials likely to encounter the registrant are notified. N.J.S.A. 2C:7-8(c)(1). If risk of re-offense is moderate, organizations in the community are also notified. N.J.S.A. 2C:7-8(c)(2). If risk of re-offense is high, members of the public likely to encounter the registrant are also notified. N.J.S.A. 2C:7-8(c)(3).
To promote uniform application of the notification guidelines, the Attorney General was authorized to "develop procedures for evaluation of the risk of re-offense and implementation of community notification." N.J.S.A. 2C:7-8(d). In response, the Guidelines were produced.
The Guidelines contain the RRAS, the validity of which has been upheld by this Court. In re Registrant C.A., 146 N.J. 71, 110, 679 A.2d 1153 (1996). The RRAS may be used by the State "to establish its prima facie case concerning a registrant's tier classification and manner of notification." Ibid. The RRAS contains four categories: seriousness of offense, offense history, characteristics of offender, and community support. Guidelines, Exhibit E at 3; Exhibit F (Jan. 2005). Within the four categories are thirteen risk assessment criteria.[5]Guidelines, Exhibit E at *421 4-8; Exhibit F. An RRAS score of 0 to 36 is low risk; 37 to 73 moderate risk; and 74 or more, high risk. Guidelines, Exhibit E at 4; Exhibit F.

III
Megan's Law has spawned a number of decisions by this Court. In Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995), we upheld the constitutionality of the statute and determined that the registration provisions apply to all convicts, all juveniles, and all those found not guilty by reason of insanity. Id. at 12, 21, 662 A.2d 367. Regarding notification, we stated:
No suggestion has been made that any registrant could be classified as posing no risk of reoffense: presumably then, all registrants will be subjected at the very least to Tier One Notification . . . .
. . . .
The only issue for the court on the Tier level of notification is the risk of reoffense . . . . That is the clear intent of the statute. All offenders required to register are, by statute, subject to at least Tier One notification, meaning that no matter how low the risk of reoffense, the Legislature has concluded Tier One notification is required.
[Id. at 22, 32-33, 662 A.2d 367.]
However, we required judicial review of Tier Two and Three classifications and manner of notification based upon procedural due process and fairness. Id. at 30, 107-08, 662 A.2d 367.
The following year in In re Registrant G.B., 147 N.J. 62, 685 A.2d 1252 (1996), we addressed the use of the RRAS in determining risk of re-offense and the use of expert testimony in tier hearings:
[I]n limited circumstances, expert testimony may be introduced at the judicial hearing in order to establish the existence of unique aspects of a registrant's offense or character that render the Scale score suspect. If believed, such evidence would lead to the conclusions that the Scale does not adequately represent the risk of recidivism for that particular registrant and that, therefore, in such circumstances the scope of notification should be more limited than that indicated by the registrant's Scale score and attendant tier classification.
[Id. at 69, 685 A.2d 1252.]
In ruling, we reasoned that although the RRAS is presumptively reliable, it is "merely a tool," and the ultimate determination of tier classification and scope of notification "is reserved to the sound discretion of the trial court." Id. at 78-79, 685 A.2d 1252. We concluded that a registrant can make three types of challenges to tier designation: (1) that the RRAS score calculation is erroneous; (2) that the case falls "outside the `heartland' of cases"; and (3) that the "extent of notification called for by his tier categorization is excessive because of unique aspects of his case." Id. at 85, 685 A.2d 1252.
In 2001, in In re Registrant J.G., 169 N.J. 304, 777 A.2d 891 (2001), we addressed the constitutionality of Megan's Law as applied to a ten-year-old boy who pled guilty to second-degree sexual assault of his eight-year-old cousin. Id. at 309, 777 A.2d 891. J.G. challenged his Tier Two classification and notification, claiming that he did not commit the act of *422 penetration to which he admitted. Id. at 309, 313-14, 777 A.2d 891.
At his tier hearing, J.G. presented his therapist's testimony that at the time of the plea, J.G. did not understand the meaning of the word "penetration" and "that he understood sex to mean the act of `rubbing against someone.'" Id. at 314-16, 777 A.2d 891. His therapist testified that, in her opinion, J.G. had not penetrated his cousin, or his sister  a dismissed charge. Id. at 310, 316, 777 A.2d 891. She further testified that J.G. presented a low risk of re-offense, making Tier Two notification unnecessary. Id. at 316, 777 A.2d 891.
The trial judge concluded that penetration had been established by clear and convincing evidence, justifying J.G.'s Tier Two classification. Id. at 318, 777 A.2d 891. The Appellate Division affirmed J.G.'s Tier Two classification but limited notification to the school that J.G. attended. Ibid.
Although we recognized the Legislature's intent to apply Megan's Law to juveniles, id. at 321, 777 A.2d 891, we pointed out that the Juvenile Code's safeguards for juvenile offenders appeared to be confounded by the requirements of Megan's Law and found a "philosophical conflict between the two statutes" based on the finite nature of the juvenile disposition versus the "potentially lifetime registration requirement imposed by Megan's Law." Id. at 324-25, 777 A.2d 891. We further underscored the "important distinction in the Juvenile Code between juveniles over and under the age of fourteen," emphasizing the prohibition on trying children under fourteen as adults. Id. at 325-26, 777 A.2d 891.
Turning to the facts of that case, and relying principally on J.G.'s uncontradicted expert testimony, we found that the trial judge's conclusion that penetration was proved by clear and convincing evidence could not be sustained. Id. at 331-32, 777 A.2d 891. We stated:
Although a substantial challenge to the factual basis for J.G.'s plea might have been asserted, the question before us is not the validity of the plea but rather whether, for purposes of the RRAS score, penetration of J.G.'s cousin was established by clear and convincing evidence. . . . In these unique circumstances, we are persuaded that neither the plea hearing, nor the collateral evidence before the Law Division, established penetration by clear and convincing evidence . . . . Based on our conclusion that the Law Division's finding on penetration is not sustainable, we reduce J.G.'s RRAS score to twenty-seven, resulting in a Tier 1 classification.[6]
[Id. at 332-33, 777 A.2d 891.]
Significantly, in J.G. we recognized that the Attorney General's Guidelines and the RRAS do not distinguish adult from juvenile offenders and do not specifically account for juveniles under age fourteen, thus potentially inflating the scores of young offenders. Id. at 333-34, 777 A.2d 891. We encouraged the Attorney General to review and modify the Guidelines and RRAS "to reflect factors and issues unique to such youthful offenders." Id. at 334, 777 A.2d 891. In the interim, we directed trial judges in Megan's Law proceedings for juveniles under fourteen "to exercise special care and discretion in determining whether the RRAS *423 score is a reliable basis for tier classification." Id. at 334, 777 A.2d 891.
We stated further:
[W]e regard as implausible and anomalous the notion that a child "sex offender" such as J.G. should pursuant to Megan's Law be subject to a lifetime registration requirement merely on the basis of a delinquency adjudication that included no effort to assess his true culpability.
Accordingly, we shall attempt to harmonize Megan's Law and the Juvenile Code in a manner that in our view best reflects the legislative objectives underlying both statutes. Although we acknowledge that registration and community notification do not constitute dispositions pursuant to the Juvenile Code, we hold, consistent with the purpose underlying N.J.S.A. 2A:4A-47(a), that with respect to juveniles adjudicated delinquent for sexual offenses committed when they were under age fourteen Megan's Law registration and community notification orders shall terminate at age eighteen if the Law Division, after a hearing held on motion of the adjudicated delinquent, determines on the basis of clear and convincing evidence that the delinquent is not likely to pose a threat to the safety of others . . . . [W]e believe our holding is faithful to the rehabilitative goals of the Juvenile Code without undermining the salutary objectives of Megan's Law.
[Id. at 336-37, 777 A.2d 891 (citations omitted).]
On June 1, 2006, after oral argument had been completed, the Attorney General issued a new Juvenile Risk Assessment Scale (JRAS). Thereafter, we requested and received the parties' comments on the JRAS. That is the backdrop for our inquiry.

IV
Because T.T. is over eighteen years of age, he may now move to terminate his registration and community notification status under J.G. If, after a hearing, the trial judge determines, on the basis of clear and convincing evidence, that T.T. is not likely to pose a threat to the safety of others, the motion will be granted. That would effectively end this case. However, should T.T. not be granted relief under J.G., the fundamental issues he has raised will continue to have currency. Accordingly, we address his arguments serially below.

A
The Appellate Division concluded that T.T. could not be subject to Megan's Law because he lacked sexual motivation and thus his crime was not of a sexual nature. Although that determination has superficial appeal, a facial reading of Megan's Law reveals it to be unavailing. N.J.S.A. 2C:7-1 specifically provides that the statute's purpose is to prevent the "danger of recidivism posed by sex offenders and offenders who commit other predatory acts against children . . . ." (Emphasis added). In other words, by its very terms, Megan's Law extends beyond purely sexual offenses and sweeps in other offenders who target children. Thus, although the Legislature has used the term "sex offender" as a catchall description for all those who commit Megan's Law offenses, the statute specifically denominates certain acts that have no sexual component as "sex offenses" subject to its purview. For example, neither criminal restraint, N.J.S.A. 2C:13-2, nor false imprisonment, N.J.S.A. 2C:13-3, contain a sexual element, yet they are included by name under Megan's Law's definition of "sex offenses" when committed against minors. N.J.S.A. *424 2C:7-2(b)(2). Accordingly, it is clear that the sexual motive engrafted by the Appellate Division as a prerequisite to Megan's Law applicability does not exist.
Further, by its own terms, Megan's Law denominates T.T.'s crime as an offense subject to its strictures. In particular, it lists "aggravated sexual assault" as a predicate offense. N.J.S.A. 2C:7-2(b). N.J.S.A. 2C:14-2 provides, in turn, that:
a. An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:
1. The victim is less than 13 years old;
. . . .
"Sexual penetration" includes the "insertion of [an] . . . object into the anus . . . either by the actor or upon the actor's instruction." N.J.S.A. 2C:14-1(c). In short, the Legislature has expressly declared the act to which T.T. pled guilty as a predicate for the application of Megan's Law. Although some of the denominated Megan's Law offenses clearly contain a requirement of sexual motivation, see, e.g., N.J.S.A. 2C:14-1(d) (sexual contact, predicate for sexual assault under N.J.S.A. 2C:14-2(b), defined to include "an intentional touching . . . of the victim's or actor's intimate parts for the purpose of . . . sexually arousing or sexually gratifying the actor."), other Megan's Law offenses do not contain such a requirement. Aggravated sexual assault is one of those others. To be sure, T.T.'s sexual motivation is relevant to his treatment and risk of re-offense and thus to tiering, however, under existing law, his lack of sexual motivation does not affect the fact that he committed the predicate offense of aggravated sexual assault and is therefore within the purview of Megan's Law. To the extent that the reasoning of the Appellate Division in In re Registrant R.B., 376 N.J.Super. 451, 870 A.2d 732 (App.Div. 2005) and In re Registrant T.S., 364 N.J.Super. 1, 834 A.2d 419 (App.Div.2003), may be read as conflicting with our conclusion, it is disapproved. In sum, we reverse the judgment of the Appellate Division that declared T.T. to be outside the ambit of Megan's Law.

B
It is well-established that a Tier Two offender may, under certain circumstances, receive Tier One notification. T.T. argues that the intra-familial nature of his offense is one of those circumstances. We agree. The RRAS characterizes intra-familial offenders as low risk under the "victim selection" criteria, specifically noting that the sexual abuse of a younger sibling indicates a low risk of re-offense. Guidelines, Exhibit E at 5. Moreover, the Guidelines provide that if the offender's past victims are members of the immediate family or same household, "then it may be determined that the offender is not a risk to community organizations or schools which would otherwise receive community notification concerning a Tier Two Offender." Guidelines, at 31. The Guidelines do not interpret family members or members of the household strictly, instead focusing on access to the victim. Ibid. It appears then, that T.T.'s frequent visits to his father's home where R.B. lived and T.T.'s sibling-like relationship with R.B. satisfy the immediate family notion under the Guidelines. Thus, under the Guidelines, T.T. may receive Tier One notification even if his Tier Two RRAS score stands.

C
T.T. has also challenged the JRAS in several respects. First, he claims that the JRAS does not address the concerns we *425 expressed in J.G. Among his arguments are the following:
a. In J.G., the Court focused on two concerns  that juveniles may lack understanding of the wrongfulness and sexual nature of their behavior and that a juvenile's JRAS score would be artificially high based upon the young age of the victim.
b. The JRAS treats juveniles unfairly because it is more difficult for them to obtain low risk ratings on the sections on force, residential support and other scale sections.
c. The section of the JRAS regarding the age of the victim is relatively unchanged from that section of the RRAS, despite this Court's specific recommendation to the contrary.
d. The JRAS treats young juveniles, particularly offenders under the age of fourteen, particularly unfairly by imposing a high-risk classification on offenders whose victim is under age eleven.
Further, although by its terms, the JRAS applies only to offenders under age 18, T.T. argues that, if modified, the JRAS (not the RRAS) is the appropriate measure for him and others like him who committed their offenses when they were children, despite their present chronological age. In support of those contentions, T.T. has submitted the certification of an expert. As might be expected, the State and the Attorney General counter T.T.'s claims, contending that the JRAS is the result of the work of their own experts and fully realizes the goals of J.G.
Because the JRAS was released during the pendency of this appeal, no trial judge has had an opportunity to consider it. Although it is true that we approved the RRAS in In re: C.A., 146 N.J. 71, 109-10, 679 A.2d 1153 (1996), there we had the benefit of a full trial record. That is not the case here and obviously, this is not a venue in which an initial disposition regarding the adequacy of the JRAS can be made.
We therefore remand to the trial judge the issues of the adequacy of the JRAS to address the concerns we expressed in J.G., particularly with respect to offenders under the age of fourteen and the applicability of the JRAS to T.T. and others like him. The judge may conduct such proceedings and take such testimony, expert and lay, as he or she deems warranted to create a record and resolve the issues presented. In the event that T.T. does not obtain relief pursuant to J.G., a new tier hearing should be held.

V
The judgment of the Appellate Division is reversed. The matter is remanded to the trial judge for proceedings consistent with the principles to which we have adverted.
Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA-SOTO join in this opinion. Chief Justice PORITZ did not participate.
For reversal and remandment  Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA-SOTO  6.
Opposed  None.
NOTES
[1] The record below is unclear on whether R.B. and T.T. have the same biological father.
[2] The RRAS is contained in the Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and Community Notification Laws (hereinafter Guidelines).
[3] Notification was to be made to certain schools, bus stops, daycare centers, and community organizations within a half-mile radius of T.T.'s home address and within a one mile radius of T.T.'s Oxford address.
[4] The Act also includes:

(2) A conviction, adjudication of delinquency, or acquittal by reason of insanity for . . . sexual assault; aggravated criminal sexual contact; kidnapping pursuant to paragraph (2) of subsection c. of N.J.S. 2C:13-1; endangering the welfare of a child by engaging in sexual conduct which would impair or debauch the morals of the child pursuant to subsection a. of N.J.S. 2C:24-4; endangering the welfare of a child pursuant to paragraphs (3) or (4) or subparagraph (a) of paragraph (5) of subsection b. of N.J.S. 2C:24-4; luring or enticing pursuant to section 1 of P.L.1993, c. 291 (C. 2C:13-6); criminal sexual contact pursuant to N.J.S. 2C:14-3b. if the victim is a minor; kidnapping pursuant to N.J.S. 2C:13-1, criminal restraint pursuant to N.J.S. 2C:13-2, or false imprisonment pursuant to N.J.S. 2C:13-3 if the victim is a minor and the offender is not the parent of the victim; knowingly promoting prostitution of a child pursuant to paragraph (3) or paragraph (4) of subsection b. of N.J.S. 2C:34-1; or an attempt to commit any of these enumerated offenses . . . .
[N.J.S.A. 2C:7-2(b).]
[5] The risk assessment criteria are: Degree of force; Degree of contact; Age of victim; Victim selection; Number of offenses/victims; Duration of offensive behavior; Length of time since last offense (while at risk); History of antisocial acts; Response to treatment; Substance abuse; Therapeutic support; Residential support; and Employment/educational stability. Guidelines, Exhibit E at 4-8; Exhibit F.
[6] The dissenters argued that the proper remedy was a motion to withdraw the plea. In re Registrant J.G., 169 N.J. 304, 346-37, 777 A.2d 891 (2001) (Coleman, J., concurring in part and dissenting in part).