# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3139-23

IN THE MATTER OF
REGISTRANT J.T.

_____

Argued November 13, 2024 – Decided December 3, 2024

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. ML-22-07-0067.

Jennifer A. Gisi, Assistant Deputy Public Defender, argued the cause for appellant J.T. (Jennifer Nicole Sellitti, Public Defender, attorney; Jennifer A. Gisi and Stephanie A. Lutz, Deputy Public Defender, of counsel and on the briefs).

Matthew E. Hanley, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the brief).

PER CURIAM

Registrant J.T.[1] appeals from an October 31, 2022 order classifying him as a Tier Two sex offender, pursuant to Megan's Law, N.J.S.A. 2C:7-1 to -23, arguing the judge used the wrong definition of penetration. We affirm.

I.

On June 17, 2020, J.T. was arrested and charged with third degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a); third degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); and two counts of fourth degree criminal sexual contact, N.J.S.A. 2C:14-3(b). He pleaded guilty to one count of fourth degree criminal sexual contact and was sentenced to two years of probation with 364 days of incarceration in county jail. His conviction triggered Megan's Law under N.J.S.A. 2C:7-2(b)(2).

The conduct underlying the conviction involved the sexual abuse of H.G., the fourteen-year-old developmentally disabled adopted daughter of his paramour, D.J. After the incident was reported to law enforcement by D.J., two police officers from the Hillside Police Department interviewed H.G. and completed an investigation report. The officer wrote that H.G. relayed that J.T. "penetrated her vagina with his fingers."

---

[1] We use initials to preserve the confidentiality of these proceedings. R. 1:38-3(c)(9).

H.G. was also interviewed by investigators at the Union County Child Advocacy Center. During this interview, H.G. reported that J.T. "grabbed her, touched her breasts, and touched her vagina in her pants inside her underwear with his hand." She explained that J.T.'s "hand moved and she demonstrated a hand gesture (four fingers of her hand together moving up and down)." H.G. demonstrated the touching with anatomical dolls by showing "the male doll reaching around with his hand and touching the female doll on her vagina under the clothes." Prior to reporting, she had disclosed to her cousin that "he touched her vagina, he put his hand in her underwear and touched her 'boobs.'"

D.J. told investigators that she first learned of the offense from the cousin who said that H.G. told her that J.T. "touched her and put his hand on her vagina." D.J. then spoke to H.G. about the offense, and H.G. told her that J.T. "put his hand on her vagina." During a consensual intercept, J.T. told D.J. that he touched H.G. "in the front part of her body; her vagina."

At his initial tier hearing on May 14, 2024, the Essex County Prosecutor's Office proposed Tier Two classification based on a Registrant Risk Assessment Scale ("RRAS") score of fifty.[2] J.T. challenged the State's scoring of factors

---

[2] The RRAS was "designed to provide prosecutors with an objective standard on which to base the community notification decision mandated by [Megan's

<span>A-3139-23</span>

two, seven, and twelve. After some discussion, the State modified its proposed score on factor seven from high to moderate risk, and J.T. withdrew his objection to the scoring of factor twelve as moderate risk. This resulted in a proposed RRAS score of 44.

J.T. maintained his objection to factor two, degree of contact, seeking a moderate risk finding which would result in a ten-point reduction and an overall RRAS score of 34, placing him in the Tier One range. The court found that there was a "touching or a rubbing of the outer vaginal area." Relying on language from Chapter 14 of the Criminal Code as well as this court's decision in State v. J.A., 337 N.J. Super. 114 (App. Div. 2001), to determine the definition of "penetration," the trial court concluded that the State " seems to establish a touching or a rubbing of the outer vaginal area and for those purposes, again, because depth of insertion doesn't make a difference . . . ." The court went on to acknowledge that the registrant didn't contest the rubbing of the vaginal area. The court thus scored J.T. as high risk on factor two.

Law] and to assure that the notification law is applied in a uniform manner throughout the State." In re C.A., 146 N.J. 71, 100-01 (1996). The RRAS "is used to assess whether a registrant's risk of reoffending is low, moderate or high." In re A.D., 441 N.J. Super. 403, 407 (App. Div. 2015).

A-3139-23

J.T. filed a motion for a stay of community notification. The trial court denied the motion for a stay pending appeal but granted a limited stay for two weeks. J.T. filed a motion for stay in this court, which we granted, and ordered an accelerated briefing schedule.

On appeal, J.T. argues:

> POINT I.
>
> THE TRIAL COURT MISAPPLIED THE LAW BY USING AN INAPPROPRIATE DEFINITION OF "PENETRATION"; UNDER ANY DEFINITION, ITS CONCLUSION OF LAW BASED ON ITS FACTUAL FINDING WAS ERRONEOUS.
>
> POINT II.
>
> HAD THE TRIAL COURT MADE FINDINGS OF FACT BASED ON THE INFORMATION CONTAINED IN THE RECORD, IT WOULD HAVE ABUSED ITS DISCRETION IN FINDING CLEAR AND CONVINCING EVIDENCE OF PENETRATION.

These arguments are unavailing. We add the following comments.

## II.

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re Registrant B.B., 472 N.J. Super. 612, 619 (App. Div. 2022). "[A]n abuse of discretion 'arises when a decision is made without a rational

5

explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The purpose of Megan's Law is "to protect the community from the dangers of recidivism by sexual offenders." C.A., 146 N.J. at 80 (citing N.J.S.A. 2C:7-1(a)). In fact, "[t]he expressed purposes of the registration and notification procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" In re Registrant A.A., 461 N.J. Super. 385, 394 (App. Div. 2019) (quoting N.J.S.A. 2C:7-1). "The law is remedial and not intended to be punitive." Ibid. (citing Doe v. Poritz, 142 N.J. 1, 12-13 (1995)).

Megan's Law "[t]ier designations reflect a registrant's risk of re-offense, as determined by a judge assessing various information, including thirteen factors referenced in the RRAS." In re Registrant C.J., 474 N.J. Super 97, 106 (App. Div. 2022) (citing A.A., 461 N.J. Super. at 402). The RRAS was developed for the State's use "to establish its prima facie case concerning a

6

registrant's tier classification and manner of notification." In re Registrant T.T., 188 N.J. 321, 328 (2006) (quoting C.A., 146 N.J. at 110). The RRAS "is presumptively accurate and is to be afforded substantial weight—indeed it will even have binding effect—unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the Scale.'" In re Registrant G.B., 147 N.J. 62, 81 (1996) (quoting C.A., 146 N.J. at 109).

The RRAS contains four categories of review: "seriousness of [the] offense, offense history, personal characteristics, and community support." State v. C.W., 449 N.J. Super. 231, 260 (App. Div. 2017) (citation omitted). "The first two categories, '[s]eriousness of [o]ffense' and '[o]ffense [h]istory,' are considered static categories because they relate to the registrant's prior criminal conduct." C.A., 146 N.J. at 103. The next two categories, "[c]haracteristics of '[o]ffender' and '[c]ommunity [s]upport,' are considered to be dynamic categories, because they are evidenced by current conditions." Ibid.

Understanding the State is responsible for initiating the tier classification process, the Supreme Court has "prescribed a two-step procedure for evidence production." Id. at 83. "In the first step, the prosecutor has the burden of going forward with prima facie evidence that 'justifies the proposed level and manner

of notification.'"  Ibid. (quoting Doe, 142 N.J. at 32).  "In the second step, assuming the prosecutor's burden is met, the registrant then has the burden of producing evidence challenging the prosecutor's determinations on both issues." Id. at 83-84.  "Once the State has satisfied its burden of going forward, the court 'shall affirm the prosecutor's determination unless it is persuaded by a preponderance of the evidence that it does not conform to the laws and Guidelines[,]'" based upon the court's independent review of the case and its merits.  Id. at 84 (quoting Doe, 142 N.J. at 32).

In addressing a registrant's classification, a judge is free to consider reliable evidence besides the RRAS score, even if such evidence would not be admissible under our Rules of Evidence, because the "hearing process . . . is not governed by the [R]ules of [E]vidence."  Id. at 83 (internal citation omitted). Thus, a reviewing judge "may take into account any [credible] information available . . . ."  Id. at 87 (quoting RRAS Manual, p. 5 (Sept. 14, 1995)).  "This may include, but is not limited to, criminal complaints not the subject of a conviction but which are supported by credible evidence, victim statements[,] admissions by the registrant, police reports, medical, psychological or psychiatric reports, pre-sentencing reports, and Department of Corrections discharge summaries."  In re C.A., 285 N.J. Super. 343, 348 (App. Div. 1995)

(citation omitted). It is evident, then, that "[j]udicial determinations regarding tier classification and community notification are within the judge's discretion and based on all of the available evidence, not simply the 'numerical calculation provided by the [RRAS].'" A.A., 461 N.J. Super. at 402 (second alteration in original) (quoting G.B., 147 N.J. at 78-79).

III.

The registrant is appealing his classification based only on the "seriousness of offense" category, which takes into account: (1) degree of force; (2) degree of contact; and (3) age of the victim(s). C.A., 146 N.J. at 103. Specifically, registrant contends the trial court, when determining the degree of contact, used the improper definition of "penetration" from Chapter 14 of the Criminal Code rather than from the Attorney General Guidelines for the Implementation of Sex Offender Registration and Notification Laws Exhibit E (rev. Feb. 2007), ("Guidelines") when determining if "penetration" occurred. Secondly, under either definition of the term, the registrant believes the court's factual finding does not constitute penetration.

Exhibit E of the Guidelines was created to assists in the implementation of the RRAS and to give prosecutors an objective standard on which to base community notification. Guidelines, at 3. The Guidelines go on to reflect that

9

"in utilizing the following criteria, the assessing individual should look to the most serious instance of each as it appears in the record" as it will achieve the objectives of protection of the public by rating the "violent, predatory offender higher than those who have not committed such offenses." Guidelines at 3, 4. They go on to give examples of the low, moderate, and high risk for each category of the seriousness of the offense, noting beforehand that "[t]hese examples are in no way intended to be exclusive." Id. at 5. In regard to "[d]egree of [c]ontact" the example given for moderate is "fondles under clothing," while the high-risk example is "penetrates orifice with object, tongue, finger or penis." Ibid.

In our criminal code, sexual penetration includes "vaginal intercourse . . . between persons or insertion of the hand, finger or object into the . . . vagina either by the actor or upon the actor's instruction. The depth of insertion shall not be relevant as to the question of commission of the crime." N.J.S.A. 2C:14-1(c). Therefore, we have held that whether defendant penetrated one's vulva, entered the vaginal vestibule, or reached the child's hymen is irrelevant. State v. J.A., 337 N.J. Super. 114, 120-21 (App. Div. 2001) (noting the legal definition of vaginal intercourse is broad because it includes not only penetration of the vagina, but also penetration of the space between the labia majora).

Contrary to registrant's argument, the RRAS manual does not define penetration. Rather, the manual gives non-exhaustive examples of what is high or medium risk. There is only one legal definition of penetration: Sexual penetration as defined in N.J.S.A. 2C:14-1(c). Since there was no definition in the Guidelines, it was appropriate for the trial court to look to our criminal code and case law interpreting this definition to determine registrant's risk.

Moreover, based on our case law interpreting the definition in the criminal code, the trial judge did not abuse his discretion in finding that the registrant digitally penetrated the victim. The incident report written by the Hillside Police documents that according to the victim the registrant "put his hand inside the front of her pants and penetrated her vagina with his fingers." The investigation report written by the Union County Prosecutor's Office, which was based on the statement of the victim, says that the registrant "touched her vagina in her pants inside her underwear with his hand." The victim said that the registrant's hand moved and demonstrated "four fingers of her hand moving up and down." When asked if the registrant put his penis in her, the victim answered, "[n]o only his finger." During a consensual intercept, the registrant admitted to touching the victim's vagina on two occasions and touching her breasts once. There was therefore ample credible evidence upon which to find that penetration occurred.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3139-23