**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2938-23

IN THE MATTER OF
REGISTRANT J.W.

_____

Submitted April 8, 2025 – Decided April 23, 2025

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. ML-07-15-0033.

Jennifer N. Sellitti, Public Defender, attorney for appellant J.W. (Michael T. Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent State of New Jersey (Natalie Pouch, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Registrant J.W.[1] appeals from a trial court order denying his motion for a

downward departure from his Tier Three high risk offender classification under

---

[1] We use initials to preserve the confidentiality of these proceedings. R. 1:38-3(c)(9).

the "heartland" exception to Megan's Law, N.J.S.A. 2C:7-1 to -23. Based on our thorough review and application of prevailing law, we affirm substantially for the reasons set forth by the trial court in its comprehensive written decision.

I.

We incorporate the facts set forth in our prior opinion In re J.W., No. A-4241-05 (In re J.W. I) (App. Div. Mar. 11, 2008) (slip op. at 2-4), and recount only salient facts for context of our decision.

In 2003, J.W. was adjudicated delinquent of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), for offenses he committed while he was a juvenile, between the ages of ten to sixteen. The conduct underlying the conviction involved the sexual assaults of three minor victims: J.W.'s seven-year-old female cousin; a female friend of his cousin; and a female friend of J.W.'s sister. In re J.W. I details the heinous nature of the assaults which began with touching, and escalated to digital penetration, intercourse, and eventually, penetration of the victims with various objects. The assaults became increasingly violent, and J.W. utilized threats to dissuade the victims from reporting.

J.W. was sentenced to serve two years of incarceration and required to comply with Megan's Law under N.J.S.A. 2C:7-2(b)(2). He was released from

the Adult Diagnostic and Treatment Center in Avenel, New Jersey in 2007 and was classified as a Tier Three offender. We affirmed the classification on appeal. See In re J.W. I.

In 2014, J.W., then thirty-two, was arrested for the sexual assault of his girlfriend's sixteen-year-old daughter. He pleaded guilty to one count of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), and was sentenced to three years' incarceration and parole supervision for life (PSL), N.J.S.A. 2C:43-6.4. On the same date, he was concurrently sentenced for failing to comply with Megan's Law registration requirements, N.J.S.A. 2C:7-2(d).

Following J.W.'s release from incarceration, he was classified under the Registrant Risk Assessment Score (RRAS) to account for the new conviction. After a hearing, the trial court found that clear and convincing evidence supported an RRAS score of ninety-three and classified J.W. as a Tier Three high risk offender. J.W. was also deemed a Tier Three high risk offender in three subsequent orders, with the most recent 2022 order memorializing the RRAS score of eighty-one.

Two years later, J.W. moved for a reduction in his classification from Tier Three to Tier Two. The trial court held oral argument on the motion, denying the application in a comprehensive written opinion.

In denying J.W.'s motion, the trial court determined there was no showing that J.W.'s offense-free seven years in the community would render him "outside the heartland" of Megan's Law cases because he reoffended. The court observed J.W.'s history of re-offending outweighs "the time [J.W.] has spent offense[-]free in the community as evidence of a lowered level of risk." The court found "[t]he time [J.W.] was offense[-]free in the community after the first offense did not prevent his conduct leading to the second offense. [J.W.'s] time offense[-]free in the community, [therefore] cannot be said to lower his risk to the point wherein Tier [Two] classification would be more appropriate."

The trial court found J.W.'s "lack of remorse or responsibility . . . deeply concerning." The court also observed contradictions between J.W.'s completion of therapy letter from Sharii Battle, MA, of Rutgers University Behavioral Health Care, and the psychosexual evaluation and actuarial risk assessment from Dr. James R. Reynolds, a licensed psychologist. Battle's letter stated J.W. "accepted full responsibility for his actions during the course of his offense and ha[d] a better understand[ing] of what is appropriate behavior," while Reynolds' report showed J.W. disavowed responsibility. J.W. maintained "he did not commit a sexual offense in either matter" and "only took the first agreement

4

because [he] was told [his] records would be sealed, and [he] wouldn't have to register. [He] took the second plea because [his] father was on his deathbed."

The trial court determined J.W. was "dishonest with Ms. Battle and faked taking responsibility for his offenses" or alternatively, "first genuinely took responsibility when meeting with Ms. Battle and then changed his mind deciding he did not commit the offenses at a later date." The court found either explanation concerning, reasoning "[J.W.'s] drastic position change is enough to call into question the reliability of Ms. Battle's opinion, as well as any belief . . . the sex-offender treatment had any positive impact on [J.W.'s] risk level."

The trial court declined to afford less weight to J.W.'s juvenile offenses because J.W. continued to offend after he was over the age of fourteen and then he offended again once released as an adult. The court reasoned "it would be absurd" to find J.W.'s "actions as a juvenile are properly attributed to the inability of juveniles to understand their actions."

Furthermore, the trial court determined Reynolds' report to be unpersuasive and not credible based on other material inconsistencies. In Reynolds' report, he stated,

> [J.W.] reportedly has <u>never</u> viewed images of child sexual abuse/exploitation materials . . . or deviant forms of pornography, such as bestiality or of sexual violence.

[J.W.] added that "<u>it's been a while</u> since I've seen any of that. Probably, over a year now."

The trial court explained Reynolds' report failed to address the inconsistent statements related to J.W.'s reported viewing of pornography and failed "to properly address . . . the impact that [J.W.'s] status as an individual who has reoffended after being released has on his risk level, as well as the effects of his sexual sadism and diagnoses of sexual paraphilic disorder."

Thus, the trial court determined J.W. had "not demonstrated by preponderance of the evidence that his is the 'unusual case where relevant, material, and reliable facts exist for which the [RRAS] [s]cale does not account, or does not adequately account,' such that [the] [c]ourt should override the RRAS score."

On appeal, J.W. raises a single point for our consideration:

> THE HEARING COURT SHOULD HAVE DEPARTED FROM THE STANDARD TIER [THREE] MEGAN'S LAW NOTIFICATION REQUIREMENTS AND ORDERED THAT J.W. BE SUBJECT TO THE TIER [TWO] REQUIREMENTS INSTEAD.

Our analysis follows.

## II.

"We review a trial court's conclusions regarding a Megan's Law registrant's tier designation and scope of community notification for an abuse of discretion." In re B.B., 472 N.J. Super. 612, 619 (App. Div. 2022). "[A]n abuse of discretion 'arises when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The purpose of Megan's Law is "to protect the community from the dangers of recidivism by sexual offenders." In re C.A., 146 N.J. 71, 80 (1996) (citing N.J.S.A. 2C:7-1(a)). "The expressed purposes of the registration and notification procedures [under Megan's Law] are 'public safety' and 'preventing and promptly resolving incidents involving sexual abuse and missing persons.'" In re A.A., 461 N.J. Super. 385, 394 (App. Div. 2019) (quoting N.J.S.A. 2C:7-1). "The law is remedial and not intended to be punitive." Ibid. (citing Doe v. Poritz, 142 N.J. 1, 12-13 (1995)).

A-2938-23

Megan's Law "[t]ier designations reflect a registrant's risk of re-offense, as determined by a judge assessing various information, including thirteen factors referenced in the RRAS." In re C.J., 474 N.J. Super. 97, 106 (App. Div. 2022) (citing A.A., 461 N.J. Super. at 402). The RRAS was developed for the State's use "to establish its prima facie case concerning a registrant's tier classification and manner of notification." In re T.T., 188 N.J. 321, 328 (2006) (quoting C.A., 146 N.J. at 110). The RRAS "is presumptively accurate and is to be afforded substantial weight—indeed it will even have binding effect— unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the [s]cale.'" In re G.B., 147 N.J. 62, 81 (1996) (quoting C.A., 146 N.J. at 109).

While "registrants cannot argue that the RRAS as a scale is unreliable," the RRAS "is not immune to specific challenges as applied to a particular registrant." In re J.G., 463 N.J. Super. 263, 274-76 (App. Div. 2020) (citing G.B., 147 N.J. at 82-84). However, an RRAS score will have a "binding effect[,] unless and until a registrant 'presents subjective criteria that would support a court not relying on the tier classification recommended by the [RRAS].'" Id. at 276 (quoting G.B., 147 N.J. at 81).

A-2938-23

In challenging a tier determination, a registrant may argue, among other points, that "the case falls outside the 'heartland' of Megan's Law cases . . . ." Id. at 275 (quoting T.T., 188 N.J. at 330).  While "few cases . . . involve facts that render the [RRAS] score suspect," the exception exists to allow judges to override RRAS scores in "unusual case[s] where relevant, material, and reliable facts exist for which the [RRAS] does not account, or does not adequately account . . . ." G.B., 147 N.J. at 82.

Because Megan's Law was enacted "to enable society 'to protect itself from sexual predators,'" a court which finds a registrant is not "the type of sexual offender contemplated by the community notification provisions of Megan's Law" may therefore effectuate a downward departure in the registrant's tier classification.  In re E.I., 300 N.J. Super. 519, 525 (App. Div. 1997) (quoting Doe, 142 N.J. at 109).  Should an expert testify to "unique aspects of a registrant's offense or character that render the [RRAS] score suspect," the court may conclude "the [RRAS] does not adequately represent the risk of recidivism for that particular registrant and . . . the scope of notification should be more limited than that indicated by the registrant's [RRAS] score and attendant tier classification." G.B., 147 N.J. at 69 (alterations in original).

A-2938-23

In addressing a registrant's classification, a court is free to consider reliable evidence besides the RRAS score, even if such evidence would not be otherwise admissible, because the "hearing process . . . is not governed by the [R]ules of [E]vidence." C.A., 146 N.J. at 83. "Judicial determinations regarding tier classification and community notification are within the court's discretion and based on all the available evidence, not simply the 'numerical calculation provided by the [RRAS].'" A.A., 461 N.J. Super. at 402 (second alteration in original) (quoting G.B., 147 N.J. at 78-79). The trial court may consider any credible information available which may include, but is not limited to, psychological or psychiatric reports. In re C.A., 285 N.J. Super. 343, 348 (App. Div. 1995) (internal citation omitted).

Here, J.W. proffered Battle's letter acknowledging his completion of sexual offender treatment and Reynolds' psychosexual evaluation and actuarial risk assessment report concluding J.W.'s risk to reoffend was lower than what was reflected by his RRAS score, posing only an average risk for recidivism. However, J.W. failed to present any evidence his offenses or character are sufficiently "unique" to merit overriding his RRAS score to conclude he poses a lower risk.

A-2938-23

We discern no error with the trial court's finding that J.W.'s evidence was not credible, deferring to the trial court's credibility determinations. In its comprehensive written decision, the trial court evaluated Battle's letter and found the impact of J.W.'s completion of sex offender treatment on recidivism was "questionable as a result of [J.W.'s] changing story on taking responsibility for his offenses," and because J.W. was recently directed to return to treatment by his parole officer.

Even if we were to discount J.W.'s failure to accept responsibility, the trial court's additional findings that Reynolds' expert report did not credibly establish J.W. presents a lower risk are substantiated in the record, alone warranting denial. Reynolds stated:

> [J.W.] is in a unique sex offender category, in that he sexually re-offended as an adult after having been previously detected, sanctioned, and treated for sexual offenses that he perpetrated as a juvenile. This is unique because global research has found that juveniles who commit sexual offenses only have a re-offense rate of approximately 5%. Additionally, [J.W.'s] juvenile sexual offenses against his cousin included acts of sexual sadism, which is an infrequent form of sexual offense. He was previously diagnosed with a sexual paraphilic disorder, as a result. That, too, rarely occurs, and sexual deviance is a known risk factor for sexual re-offending.

A-2938-23

Reynolds failed to connect J.W.'s re-offending as an adult and sexual deviance with a <u>lower</u> Megan's Law risk level. There is no explanation as to why J.W. is uniquely <u>less</u> likely to re-offend nor is there any proffered nexus between the statistics and J.W.'s risk level. Instead, Reynolds seems to highlight a potentially <u>increased</u> risk.

After fully considering the record, the trial court found J.W. failed to show relevant, material, and reliable facts as to the unique nature of his offenses or character for which the RRAS does not account. We conclude the trial court's well-supported denial of J.W.'s request to reduce his Megan's Law obligations through a change in tier classification was not an abuse of discretion and is supported by the substantial, credible evidence in the record.

To the extent we have not specifically addressed any of the parties' legal arguments it is because we have concluded they are of insufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

12

A-2938-23